**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**

| | |
|---|---|
| JUDITH COLLINS, Individually and as Personal Representative of the ESTATE OF MICHAEL N. COLLINS, Deceased, )<br><br>Plaintiff, )<br><br>v. )<br><br>UNITED STATES OF AMERICA, )<br><br>Defendant. ) | Civil Action No. _____ |

## COMPLAINT

Judith Collins, individually and as Personal Representative of the Estate of Michael N. Collins, deceased, by counsel, states as follows for her Complaint against Defendant United States of America:

### Jurisdiction and Venue

1.     Ms. Collins is the proper Personal Representative of the Estate of Michael N. Collins and the proper party to bring all claims against Defendant in this action.

2.     This action arises under the Federal Tort Claims Act, 28 U.S.C. § 2671 *et seq*. This Court is vested with jurisdiction to adjudicate this dispute pursuant to 28 U.S.C. § 1346(b).

3.     In compliance with 28 U.S.C. § 2675, a notice of administrative claim was filed with the Department of Veterans Affairs, which is attached as **Exhibit A**. That claim was received by the Department of Veteran Affairs on May 27, 2021.

4.     The Department of Veterans Affairs denied the administrative tort claim on September 21, 2021.

5.     Accordingly, Plaintiff's causes of action are ripe to be litigated in this Court pursuant to 28 U.S.C. § 2675(a).

6.      Further, this action is properly brought within the six-month period set forth in 28 U.S.C. 2401(b).

7.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1402(b) as the cause of action as to Defendant United States arose within the Eastern District of Kentucky at the Lexington VA Health Care System ("Lexington VAMC") at 1101 Veterans Drive, Lexington, Kentucky 40502.

8.      At all times relevant to this action, the United States owned and operated the Lexington VAMC and its affiliated outpatient care centers.

9.      At all times relevant to this action, the agents, servants, employees, and personnel of the United States were acting within the course and scope of their employment in providing and/or failing to provide medical care and treatment to Mr. Collins.

10.     Mr. Collins is a veteran of the United States Army, and thus was entitled to medical care and treatment at the Lexington VAMC and its affiliated outpatient care centers.

11.     The medical care described as follows was provided to Mr. Collins at the Lexington VAMC and/or its affiliated clinics unless otherwise stated.

12.     Plaintiff "has reviewed the facts of the case and has consulted with at least one (1) expert qualified pursuant to the Kentucky Rules of Civil Procedure and the Kentucky Rules of Evidence who is qualified to give expert testimony as to the standard of care or negligence and who the claimant or his or her counsel reasonably believes is knowledgeable in the relevant issues involved in the particular action, and has concluded on the basis of review and consultation that there is reasonable basis to commence the action." K.R.S. § 411.167(2)(a). Counsel's certificate of merit is attached as **Exhibit B**.

## **Allegations**

13.     Plaintiff restates and re-alleges paragraphs 1 through 12 as if fully stated herein.

14.     On January 19, 2020, Mr. Collins, a 67-year-old Army veteran, died from a massive pulmonary hemorrhage caused by extensive lung cancer that had gone undiagnosed and untreated by Lexington VAMC healthcare providers.

15.     Mr. Collins was a lifelong smoker and was documented as having a 50 pack-year smoking history. This substantial smoking history was well documented by Mr. Collins' medical providers at the Lexington VAMC.

16.     Lung cancers can be detected early by low-dose CT scans ("LDCTs" or "LDCT scans"), which are efficient, non-invasive scans that provide three-dimensional X-rays of the lungs. As compared to traditional X-rays, LDCTs are very detailed and can detect smaller lung cancers in early stages.

17.     As a lifetime smoker above the age of 55, Mr. Collins qualified for and should have received annual screenings for lung cancer with LDCTs at the Lexington VAMC.

18.     Timely LDCTs would have detected Mr. Collins's lung tumor far earlier, allowed for more conservative interventions and treatment options, extended his life, and prevented subsequent complications that led to his death.

19.     The U.S. Preventative Services Task Force (USPSTF) recommends yearly lung cancer screenings with LDCTs for people who: (i) have a 20 pack-year or more smoking history; (ii) smoke now or have quit within the past 15 years; and (iii) are between 50 and 80 years old.

20.     The American Cancer Society (ACS) has similar, albeit more stringent recommendations, recommending yearly LDCTs for people who are (i) aged 55 to 74 years and in fairly good health; (ii) currently smoke or have quit within the past 15 years; (iii) have at least a

30-pack-year smoking history; (iv) receive smoking cessation counseling if they are current smokers; (iv) have been involved in informed/shared decision making about the benefits, limitations, and harms of screening with LDCT scans; and (v) have access to a high-volume, high-quality lung cancer screening and treatment center. One "pack-year" is defined as smoking an average of one pack of cigarettes per day for one year.

21.     The Veterans Health Administration adopted a similar set of criteria modeled after the USPSTF and ACS and recommends such screenings if the patient has all three of the following risk factors: (i) 55-80 years old; (ii) a current smoker or a former smoker who quit less than 15 years ago; and (iii) a smoking history of at least 30 pack-years.

22.     The VHA provides LDCT scans in its radiology departments, and recommends screening be done once a year for as long as recommended by a provider.

23.     Mr. Collins met all three sets of criteria and should have been offered yearly LDCTs by the Lexington VAMC. At the time of his death, Mr. Collins was 67 years old. He smoked regularly and communicated to his health care providers on several occasions he smoked 1 pack per day and had been doing so for the past 50 years.

24.     A discharge summary on January 17, 2020, shortly before his death, noted "current smoker; 1 ppd x 50 years" and recommends "tobacco cessation counseling prior to discharge." Notes from prior visits show the same smoking habits ("1 ppd for last 50 years" noted on 12/31/2019; "smokes 1 PPD" noted on 12/01/2019; "smokes 1/2 ppd" on 1/28/2019; "he smokes 1 ppd and states he would like to quit smoking" on 7/31/2017; "tobacco use: 1 ppd" and "counselled on diet, exercise, tobacco and ETOH cessation" on 2/25/2016).

25.     Given that Mr. Collins smoked 1 pack per day for 50 years, he had a smoking history well in excess of the 20 to 30 pack-year history required to qualify for regular screenings.

26.     Further, Mr. Collins received or was offered smoking cessation counseling on several occasions ("tobacco cessation counseling prior to discharge" on 1/18/2020; "patient was offered FDA-approved cessation medications" on 1/13/2020; "patient does not want to participate in the Tobacco Cessation Program" on 12/31/2019; "education provided [on nicotine dependence]" on 7/30/2019; "pt is aware of availability of support groups/education/other resources to help with smoking cessation at the VA" on 11/03/2016; counseled on tobacco cessation on 2/25/2016) .

27.     For years before his untimely death, Lexington VAMC healthcare providers were aware of Mr. Collins's smoking habits and his inability to quit, and therefore knew or should have known he had risk factors which qualified him for yearly LDCT screenings.

28.     Although Mr. Collins qualified for yearly LDCTs, he was not informed about or offered such annual screenings. Indeed, Mr. Collins received chest x-rays, once as part of a primary care visit in 2016, but received no further chest imaging until 2019, when he was admitted to the Lexington VAMC in December 2019.

29.     Specifically, on February 25, 2016, Dr. John R. Furcolow noted in a primary care visit that Mr. Collins received a chest x-ray with normal results in 2014 ("CXR OK 2014"). Dr. Furcolow did not note in the treatment plan and health maintenance sections of his note, or elsewhere, that Mr. Collins should receive LDCT screenings. In fact, the notes demonstrate it was Mr. Collins himself who requested a repeat chest x-ray.

30.     On October 24, 2016, Dr. Furcolow noted in another primary care visit note that Mr. Collins received a chest x-ray in March 2016 with normal results ("CXR OK 3/16"). There was extensive documentation of preventative medicine from this visit: depression, alcohol, and physical abuse screenings were all documented. Smoking cessation was also discussed.

Remarkably, however, Dr. Furcolow again did not document that Mr. Collins should receive LDCT lung cancer screenings in the future, despite counseling Mr. Collins on the risks and benefits of other routine preventative procedures, such as a colonoscopy.

31.     Nearly a year later, on July 31, 2017, Mr. Collins had a primary care visit with Dr. Billy Banks for ongoing management of his active and chronic medical issues, including coughing and wheezing. Mr. Collins was 65 at the time, and reported he was still smoking 1 pack of cigarettes per day. Although primary care nursing notes from the same day indicate Mr. Collins was "advised to quit tobacco" and offered "tobacco cessation medication," he was neither scheduled for nor recommended a chest x-ray for his respiratory complaints or an LDCT lung cancer screening in light of his risk factors.

32.     Mr. Collins did not receive any other chest imaging from his Lexington VAMC medical providers until December 2019.

33.     On December 1, 2019, Mr. Collins visited the Lexington VAMC in preparation for a colonoscopy the following day. He communicated to healthcare providers he felt weak when he walked, and that he was experiencing numbness in his right arm with shortness of breath.

34.     On December 3, 2019, Dr. Beth J. Arnold diagnosed him with atrial fibrillation ("AFib") and stroke, and Mr. Collins was placed on anti-coagulants to help manage his conditions. He was prescribed 5 mg of Apixaban to be taken daily, a regularly prescribed dose of this anticoagulant medication, and was admitted for observation for three days.

35.     Notably, during this hospitalization, on December 2, 2019, Mr. Collins received a chest x-ray, which revealed "lobular configuration [in] the right infrahilar region with streaky and patchy peri bronchial opacity in the medial aspect of the right lower lung" in "comparison to prior exam [on] 03/18/2016." Dr. Benjamin H. McQuaide, reviewing radiologist, also noted the

"appearance of the right infrahilar region" was "abnormal" and may have reflected "pneumonia or [an] underlying space occupying lesion with atelectasis," i.e., a tumor or abscess with a partly or completely collapsed lung. The radiology report further noted possible malignancy, and that additional action was needed. However, no further follow up occurred until Mr. Collins was admitted for hemoptysis nearly a month later.

36.     On December 30, 2019, Mr. Collins presented to the Lexington VAMC emergency department for hemoptysis, a condition which can be brought on by lung cancer and can result in death from acute airway obstruction and hypoxemic respiratory failure. Initial treatment for hemoptysis includes intubation, or a tube that goes into a patient's airways, followed by ventilation, or extra oxygen. Once the source of the bleeding is located, healthcare providers may try to stop the bleeding with medications to narrow blood vessels (vasoconstrictors), or to help blood clot (coagulants).

37.     On December 31, 2019, the day following his diagnosis of hemoptysis, a chest CT scan revealed Mr. Collins had a mass with suspected malignancy measuring 8.5 x 7.1 x 7.0 cm in his lower right lobe. Dr. Sean Michael Lockwood, Attending Physician, noted the lesion was "highly suspicious for lung cancer pulmonology." Mr. Collins also reported he had been coughing up blood in the prior two weeks. On the same day, Dr. Ketan Buch, Staff Physician, and Dr. Robin Paudel, Pulmonary Fellow, agreed Mr. Collins would benefit from a bronchoscopy with biopsy and an endobronchial ultrasound ("EBUS"), a minimally invasive procedure used to diagnose infections and other diseases affecting lymph nodes in the chest. The earliest date available for the EBUS was January 16, 2020, and Mr. Collins and his family decided it would be best to have both the EBUS and bronchoscopy done in the same setting.

38.     On the following day, January 1, 2020, Dr. Lockwood declined to perform an emergent bronchoscopy because Mr. Collins's "hemoptysis [was] slowing" with "just scant blood mixed with sputum." Along with Dr. Minus Helton, Medical Resident, Dr. Lockwood discussed the risks and benefits of Mr. Collins continuing to take the anticoagulation medication he was prescribed on December 3, 2019, to manage his AFib and prevent another stroke. Dr. Sally Mathias, Attending Physician, noted Mr. Collins "being on anticoagulation" put him at "higher risk of bleeding with any emergency procedures" and recommended holding anticoagulation medications for at least 5 days prior to any procedures. At Dr. Lockwood's recommendation, Mr. Collins stopped taking anticoagulants all together.

39.     Prior to his discharge on January 1, 2020, Mr. Collins was prescribed 100 mg capsules of Benzonatate, a medication used to treat the symptoms of cough, and advised to discontinue and discard any remaining supply of Apixaban. No other interventions were taken by Dr. Lockwood or Mr. Collin's other Lexington VAMC medical providers to address his unresolved hemoptysis.

40.     Complaints Mr. Collins made regarding his continuing hemoptysis support the finding that his hemoptysis reflected an underlying lung cancer, and that his healthcare providers failed to treat him in a timely manner.

41.     On January 7, 2020, Mr. Collins reported to Tisha F. Connor, Oncology Nurse Navigator, that his "main concern [was] waiting on [his] upcoming procedure" and that he continued to "cough up blood daily." Although Nurse Connor noted his request for an earlier appointment, his biopsy was not rescheduled earlier than January 16. Consequently, Mr. Collins continued to suffer from hemoptysis until his final days, when he died of the condition on January 19.

42.     Had Dr. Lockwood or other healthcare providers intervened sooner to address the hemoptysis, Mr. Collins would have been relieved of the extraordinary suffering he experienced and the condition that caused his untimely death resolved.

43.     On January 16, 2020, Dr. Thomas Wallace proceeded with the scheduled biopsy at the Lexington VAMC. The initial results of the EBUS biopsy indicated a partially obstructing mass at the bronchus intermedius in the right lung, obstructing about 30% of the airway. Preliminary results indicated the lesion was "suggestive of non-small cell carcinoma," and the pathology report from January 17, 2020, diagnosed the lesion as "invasive moderately differentiated squamous cell carcinoma." The cancer was staged "[a]t least a Stage IIIc (cT4 cN3 cMx), though if pleural fluid malignant[,] would upstage to Stage IVa." The blood loss resulting from the procedure was minimal, and Mr. Collins was sent home.

44.     On the evening of January 16, 2020, Mr. Collins presented to the Whitesburg ARH ER with complaints of coughing up blood. He was transferred and admitted to the Lexington VAMC ICU in the early morning of January 17, 2020. On arrival, he was hemodynamically stable, and reported he had no hemoptysis since 05:30. However, at approximately 09:00, Mr. Collins began having massive hemoptysis with significant respiratory distress, and was emergently intubated. A bronchoscopy revealed a mass in his right lower lobe with clot, but no signs of active bleeding.

45.     Overnight, Mr. Collins had recurrent hemoptysis with an estimated blood loss of 200 ml. A repeat bronchoscopy revealed a large clot covering the entrance to the bronchus intermedius, the site of the biopsy, with a mass located behind the clot with no active bleeding. Dr. Angel Coz-Yataco, Attending Physician, and Dr. Wallace conferred and elected to leave the clot sit, as removing it would likely have made Mr. Collins bleed further.

9

46.     Mr. Collins again suffered massive hemoptysis on the evening of January 18, 2020. Dr. Coz-Yataco noted he coughed up 300 ml of bright red blood. Another emergent bronchoscopy revealed the blood clot at the entrance to his bronchus intermedius had dislodged. The bronchoscopy also showed an actively bleeding tumor.

47.     Mr. Collins was transferred to UKMC for a higher level of care and radiation treatment, which were not available at the Lexington VAMC facility. Shortly after his transfer, however, Mr. Collins died on January 19, 2020. The death certificate lists the cause of death as a massive pulmonary hemorrhage caused by non-small cell lung cancer.

48.     As a result of the failure of his VA healthcare providers to timely screen Mr. Collins on a yearly basis for lung cancer, Mr. Collins experienced a delay in diagnosing and treating his lung cancer, resulting in complications consisting of repeated episodes of massive hemoptysis, which led to his death on January 19, 2020.

49.     Indeed, there was a clear-cut breach of the standard of care by Drs. Furcolow and Banks. Mr. Collins was clearly a candidate for LDCT screening for lung cancer. Despite the history of smoking, efforts at smoking cessation, and extensive smoking discussions repeatedly documented in Mr. Collin's VA medical records, screening was never offered, ordered, or recommended for him. The failure to do so was a breach of the standard of care.

50.     Further, when Mr. Collins presented to Dr. Banks on July 31, 2017 with respiratory symptoms, it was a breach of the standard of care for Dr. Banks to fail to order a chest x-ray.

51.     Had the standard of care been complied with and Mr. Collins' VA providers scheduled him for LDCT lung cancer screening and other timely and appropriate imaging, the lung cancer would have been discovered at a sufficiently early stage such that treatment would have been successful, and Mr. Collins would be cancer-free and alive today.

10

## **Wrongful Death**

52.     Plaintiff restates and re-alleges paragraphs 1 through 51 as if fully stated herein.

53.     As a provider of medical services to Mr. Collins, the United States and its agents, servants, or employees at the Lexington VAMC and its affiliates, including but not limited to Drs. Furcolow and Banks, owed Mr. Collins a duty to provide him medical care consistent with the governing standard of medical care.

54.     The agents, servants, or employees of the United States at the Lexington VAMC and its affiliates, including but not limited to Drs. Furcolow and Banks, while acting within the scope of their employment, violated the applicable standards of medical care in the following respects:

       a.      Negligent delay in recognizing Mr. Collins qualified for annual LDCTs as a smoker and recommending, counseling, and ordering the same;

       b.      Negligent delay in order appropriate chest imaging;

       c.      Negligent delay in diagnosing and providing appropriate treatment for lung cancer; and

       d.      Any and all other deviations from the standard of care which will be developed through further investigation, discovery, and expert review.

55.     As a direct and proximate result of the forementioned negligence of Defendant, Mr. Collins suffered premature death from lung cancer, and significant pain and suffering.

56.     Consequently, Plaintiff claims the following damages:

       a.      Compensation for mental and physical pain and suffering, mental anguish, and emotional distress of Mr. and Ms. Collins;

b.      Compensation for all economic damages, including medical, funeral, burial, administrative, and estate bills and expenses, incidental expenses, loss of income, benefits, financial support, and earnings, and loss of earning capacity;

c.      Compensation for loss of consortium, services, assistance, companionship, care, nurturing, society, support, and marital relationship; and

d.      Compensation for any other damages sustained by Plaintiff as a proximate result of the negligence of the government's employees and/or agents.

### Loss of Consortium

57.     Plaintiff restates and realleges paragraphs 1 through 56 as if fully stated herein.

58.     On January 19, 2020, Mr. Collins died from lung cancer, giving rise to a negligence claim against Defendant United States.

59.     At the time, Mr. Collins was married to Plaintiff Ms. Collins, who is now a widow as a result of Mr. Collins' wrongful death.

60.     As a direct and proximate result of the negligence of the agents, servants, and employees of Defendant, Ms. Collins has sustained pecuniary loss and the loss of consortium, society, companionship, and services of her husband.

61.     Consequently, Plaintiff claims the following damages:

a.      Compensation for loss of consortium, services, assistance, companionship, care, nurturing, society, support, and marital relationship; and

b.      Compensation for any other damages sustained by Plaintiff as a proximate result of the negligence of the government's employees and/or agents

WHEREFORE, Plaintiff requests the Court grant judgment in her favor against Defendant in the amount of Three Million Dollars ($3,000,000.00), together with any other costs as she may be lawfully entitled to recover.

Respectfully submitted,

**JUDITH COLLINS, INDIVIDUALLY AND AS PERSONAL REPRESENTATIVE OF THE ESTATE OF MICHAEL N. COLLINS**

By:     /s/ Roger N. Braden
Roger N. Braden, KY Bar No. 06883
Braden & Associates, PLLC
7000 Houston Road, Suite 5
Florence, KY 41042-4873
(859) 414-0777
(859) 993-0350 – Facsimile
rnb@bhdlaw.net
*Counsel for Plaintiff*