UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
(at Lexington)

| | |
|---|---|
| JUDITH COLLINS, Individually and as Executor of the Estate of Michael N. Collins, | ) ) ) ) |
| Plaintiff, | ) Civil Action No. 5: 22-008-DCR ) |
| V. | ) ) |
| UNITED STATES OF AMERICA, | ) **MEMORANDUM OPINION** ) **AND ORDER** |
| Defendant. | ) |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

Plaintiff Judith Collins filed this medical negligence action on behalf of herself and her late husband's estate under the Federal Tort Claims Act. Michael Collins was a veteran of the United States Army who received medical care at the Lexington, Kentucky VA Medical Center ("VAMC") and an affiliated outpatient care center in Hazard, Kentucky. The plaintiff contends that the VAMC was negligent by failing to provide Collins with low dose computed tomography ("LDCT") screenings for lung cancer, which he succumbed to in January 2020. However, the undersigned concludes that the defendant is entitled to summary judgment because the plaintiff has not raised a genuine issue of material fact indicating that the VA breached the applicable standard of care.

**I.**

Michael Collins was 67 years old when he passed away on January 19, 2020. He had a history of smoking a pack of cigarettes per day for 47 years. His other chronic health conditions included low back pain, mixed hyperlipidemia, hypertension, and chronic

obstructive pulmonary disease.  [*See* Record No. 38-5.]  As a resident of Whitesburg, Kentucky, Collins received primary care services at a VA outpatient clinic in Hazard, Kentucky.  Additionally, he visited the VAMC in Lexington on occasion.  Primary care physician Renuka Reddy, M.D., ordered a chest x-ray in September 2014 due to Collins' history of smoking. The x-ray report noted "clear chest" and "no acute cardiopulmonary pathology."  [*See* Record No. 38-12, p. 10.]

Collins saw primary care provider John Furcolow, M.D., in May 2015.  He had no new complaints at that time.  Furcolow made note of Collins' smoking history, the clear chest x-ray in 2014, and encouraged Collins to stop smoking.  Collins saw Furcolow again in February 2016 for a follow-up visit regarding his chronic medical problems.  Furcolow noted that Collins wanted a "repeat" chest x-ray.  Furcolow educated Collins regarding smoking cessation; however, Collins declined assistance.  Collins received a chest x-ray on March 18, 2016, which was again noted as "clear chest."  [*See* Record No. 38-6, pp. 4-5.]

Collins began treatment with primary care provider Billy Banks, D.O., at the Hazard VA, on July 31, 2017.  [*See* Record No. 38-9.]  Banks noted that Collins was still smoking one pack of cigarettes per day.  Collins wanted to quit smoking and Banks dispensed gum for Collins' nicotine dependence.  Collins denied shortness of breath, coughing, or wheezing. Collins followed up with Banks in April 2018 and reported that he had cut down to one-half pack of cigarettes per day.  *Id.* p. 4.  He had no acute complaints and again denied shortness of breath, coughing, or wheezing.  Banks continued to encourage smoking cessation. There is

some dispute regarding whether Banks encouraged Collins to have additional lung screenings during this time.[1]

Collins followed up with Banks again in January 2019. He reported that he was still smoking one-half pack of cigarettes each day and was not ready to quit smoking completely at that time. *Id.* at 6. And Banks continued to encourage Collins to stop smoking. Collins saw Kim Gayheart, APRN, in June and July 2019, complaining of coughing and congestion. During these appointments, Collins denied chest pain, shortness of breath on exertion, or wheezing.

Collins returned to see Banks on August 16, 2019. During this examination, he complained of coughing and wheezing, which had improved, but denied having any shortness of breath. Banks prescribed medication for Collins' cough. Collins returned for a follow up visit with Banks on September 30, 2019, at which time Collins reported that his breathing had returned to a baseline level. He also denied chest pain, shortness of breath, coughing, or wheezing. Banks again urged Collins to stop smoking and offered assistance regarding his nicotine dependence. But Collins advised Banks he did not want to quit completely at that time. Collins returned for an appointment with Banks in October 2019 to discuss his blood pressure. He again denied shortness of breath, coughing, and wheezing.

Collins presented to the Lexington VAMC emergency department with transient neurological deficits in December 2019. He subsequently was admitted to the Lexington

---

[1]   Banks did not remember a specific conversation with Collins but stated that his practice was to order LDCT lung cancer screenings for high risk patients when they became available at the VAMC. He could not recall exactly when they became available. Banks remembered Collins as someone who did not like to travel to Lexington for tests and believed that he declined the test when it was offered. However, Banks did not document this information in his treatment notes.

VAMC and diagnosed with atrial fibrillation, treated with blood thinner, and discharged. Soon thereafter, Collins began coughing up small amounts of blood and returned to the emergency department where a CT scan revealed a lung mass. Collins underwent a bronchoscopy with endobronchial ultrasound and endobronchial biopsy for the right lower lobe mass at the Lexington VAMC on January 16, 2020. After returning home from the procedure that evening, he went to the Whitesburg Appalachian Regional Hospital ("ARH") because he began coughing up blood.

Whitesburg ARH transferred Collins to the Lexington VAMC *via* ambulance on the morning of January 17, 2020. Shortly after his arrival, he began having massive hemoptysis with significant respiratory distress and was emergently intubated. Providers found that Collins had a clot sitting on the lung mass. The results from his bronchoscopy/biopsy came back as stage IIIc or IVa squamous cell carcinoma. On January 19, 2020, Collins was transferred to the University of Kentucky Medical Center. He died that day due to a large volume pulmonary hemorrhage.

In 2013, the U.S. Preventive Services Task Force ("Task Force") recommended annual screenings for lung cancer with LDCTs in 55 to 80-year-olds with a thirty-pack-year smoking history who currently smoke or had quit within the past 15 years. [Record Nos. 38-10, p. 5; 38-12] The American Cancer Society issued similar recommendations for the first time that year. [Record No. 38-10, p. 6] The VA created a "shared decision making document" entitled "Screening for Lung Cancer" in April 2014. The document outlines the Task Force's recommendations for annual screenings. [*Id.* at 8; 38-3] However, it is unclear if, how, and to whom it was distributed. In February 2015, the Centers for Medicare and Medicaid Services issued a decision memorandum adopting similar recommendations regarding lung cancer

screening with LDCTs. *Id.* In August 2016, the VA's National Leadership Council "approved recommendations for lung cancer screening with [LDCTs]."

The Lexington VAMC began the process of purchasing a machine capable of performing LDCTs in 2016. *Id.* p. 12. It was installed in 2017 and "became operational" in February 2018. *Id.* In September 2018, the VA held a preplanning meeting for implementation of LDCT lung cancer screening. The following month, a VA summit was held to further discuss how to implement the LDCT screenings. The Lexington VA then considered a software purchase to "accomplish the tracking that is necessary when you [are] doing lung cancer screening." *Id.* LDCT lung cancer screenings first became available at the Lexington VAMC in January 2019.[2] *Id.* at 13.

The plaintiff contends that, had Collins' primary care physicians provided LDCT lung cancer screenings, his cancer would have been detected earlier, he could have received more conservative interventions and treatment options, extending his life, and preventing subsequent complications that led to his death. Accordingly, she asserts a medical malpractice claim against the United States under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2671 *et seq*. The United States has moved to exclude the testimony and opinions of the plaintiff's expert witnesses or, in the alternative, for summary judgment.

## II.

Rule 702 of the Federal Rules of Evidence governs the admission of expert testimony. Under Rule 702, a court should only admit relevant expert testimony if "(1) the testimony is

---

[2] The government's corporate designee, Jeffrey Honeycutt, M.D., discussed at length why the VA could not just "start doing scans" upon obtaining the machine. [Record No. 38-10, pp. 19-20]

based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." District courts act as gatekeepers to exclude any testimony that is not relevant or reliable. *See Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 145 (1999) (citing *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993)). Rule 702 applies regardless of whether the trier of fact is a judge or a jury. *UGI Sunbury LLC v. A Permanent Easement for 1.7575 Acres*, 949 F.3d 825, 832 (3d Cir. 2020) (observing that Rule 702 employs broader "trier of fact" language compared to Rule 403, which refers to "misleading the jury"); *Ky. Waterways All. v. Ky. Utils. Co.*, 539 F. Supp. 3d 696, 710 (E.D. Ky. 2021).

Summary judgment is appropriate if there is no genuine dispute with respect to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In other words, the moving party must show the absence of a genuine issue of material fact concerning an essential element of the opposing party's action. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In reviewing a motion for summary judgment, the Court must view all facts and draw all reasonable inferences in a light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986). The moving party has the initial burden to show that there is no genuine issue of material fact, but once the moving party has met its burden, the nonmoving party must demonstrate that there is sufficient evidence from which the finder of fact could render a verdict in its favor. *See Celotex Corp.*, 477 U.S. at 324.

### III.

The allegedly negligent acts occurred in the Commonwealth of Kentucky, so the substantive law of Kentucky applies in this case. *See Ward v. United States*, 838 F.2d 182,

184 (6th Cir. 1988); 28 U.S.C. § 1346(b). To establish medical malpractice under Kentucky law, the plaintiff must prove, by expert testimony: (1) the standard of care recognized by the medical community, as applicable to the particular defendant; (2) that the defendant departed from the standard of care; and (3) that the defendant's departure from the standard of care was a proximate cause of the plaintiff's injuries. *Heavrin v. Jones*, 2003 WL 21673958, at *1 (Ky. Ct. App. July 18, 2003).

The plaintiff presents the opinions and testimony of John Daniel, M.D., to establish the applicable standard of care. Daniel is a board certified internist with 42 years of experience. He works as a primary care provider in Virginia, but also remotely oversees occupational health clinics in Tennessee and Kentucky. Daniel provided a report that makes reference to the U.S. Preventive Service Task Force's 2013 recommendation regarding annual LDCTs for high risk individuals. He went on to state that the VA "adopted the same screening guidelines in 2014" and that Collins' primary care physicians' failure to order or recommend this testing from 2015 through 2019 "was a breach of the standard of care for reasonably prudent primary care providers." [Daniel Report, Record No. 38-13, p. 2]

Daniel was questioned extensively regarding the standard of care during his deposition. He clarified that the 2013 Task Force recommendation did *not* establish the standard of care. Instead, it merely gave recommendations and "started the process rolling because of the federal bureaucracy to get an implementation." [Record No. 38-12, p. 17] In other words, the Task Force recommendations "could be the goal, but they're not going to set the standard."

When asked to provide his basis for concluding that the VA adopted the Task Force recommendations in 2014, Daniel responded:

> I got it from an article that was written about, when they did it, they said they adopted a medical form, I could find out different things, National Cancer Screening Utilization Trends and Veterans Administration lung cancer screening by geography. There's various other articles that the VA wrote that was 2014, and then they had an article that was here that was a JAMA article that said that they had approved, they underwent the reviews and those dates are in there as well for that article, that's implementation of lung cancer screening by the Veteran's Health Administration. So they were working on getting a protocol set together from 2013 to 2015.

*Id.* p. 10. Daniel went on to cite the 2014 shared decision making document, which he characterized as a "handout that was directed at patients rather than physicians." *Id.* at 11. He then testified that the VA National Leadership Council approved the recommendation for lung cancer screening with LDCTs in August 2016, although Daniel admitted he "[had] no idea how they decide things or implement things."[3] *Id.*

Courts rely on medical experts to provide information regarding the applicable standard of care. *Blair v. Eblen*, 461 S.W.2d 370, 373 (Ky. Ct. App. 1970). Kentucky law provides the guiding principle, however, that physicians are required to use knowledge, skill and care as is exercised by reasonable physicians under the same or similar circumstances. Evidence of the standard of care "may include the elements of locality, availability of facilities, specialization or general practices, proximity of specialists and special facilities as well as other relevant considerations." *Id.*

While medical experts certainly may provide opinions based on their own training and experience, they may not provide opinions or testimony based on naked conclusions or

---

[3] During his deposition, Daniel also cited a 2022 article from the Annals of Internal Medicine, which he did not mention in his report. According to Daniel, this article includes a recommendation from the American College of Physicians-Internal Medicine "to keep doing the screening." [Record No. 38-12, p. 21] Daniel did not explain how the information presented in the article would inform the standard of care that existed from 2015 through 2019. It does not appear that the plaintiff has provided a copy of the article.

unsupported facts. *See Kumho Tire Co., Ltd.*, 526 U.S. at 157 (noting that courts are not required to admit evidence that is connected to data only by the *ipse dixit* of the expert); *Ferguson v. United States*, 2016 WL 11784204 (W.D. Ok. Sept. 20, 2016) (declining to simply accept physician's opinion and observing that even a qualified physician must explain how his experience leads to his standard of care conclusions); *West v. United States*, 502 F. Supp. 3d 1243, 1251 (M.D. Tenn. 2020) (applying Tennessee law, explaining that experts must indicate how they are familiar with the standard).

Daniel has not pointed to any facts supporting his assertion that the accepted standard of care for reasonable primary care providers during the relevant period was to order yearly LDCTs for patients like Collins. First, Daniel did not testify that he ordered such tests for his own patients. Further, he did not discuss the screening practices of other primary care providers in Kentucky or elsewhere. Daniel also failed to address how the availability of LDCTs impacted the standard of care. He appeared to suggest that the Lexington (and possibly Hazard) VAMC was lagging behind its private counterparts by failing to offer LDCTs in 2015 through 2019. However, Daniel failed to provide any information about whether LDCTs were available elsewhere in the community or in more remote locations. He conceded that he was unaware of whether the University of Kentucky Medical Center, a leading research hospital in the state, possessed the technology to perform this testing. [Record No. 38-12, p. 12] His vague assertion that "there are other places that were doing them at that time" is insufficient to establish that performing LDCTs was the standard of care. *See id.*

Although it is the plaintiff's burden to prove the standard of care through expert testimony, the Court also notes that the VA physicians' testimony suggests that yearly LDCTs were not the generally accepted standard of care at the relevant time. Jeffrey Honeycutt, M.D.,

is a radiologist at the Lexington VAMC and was instrumental in bringing LDCTs to that facility. Honeycutt explained that, prior to 2019, "[i]t was very hard to find any hospital systems or imaging establishments that could offer that service, especially in a timely fashion." [Record No. 35, p. 77] Collins' treating physician Billy Banks also did not recall LDCTs being available in the community until 2019.[4] [Record No. 29, pp. 48, 65]

Contrary to Daniels' assertion, Honeycutt's admission that annual LDCTs "are the best way that modern society has to catch early developing lung cancers in heavy smokers" does not establish that that LDCTs were required by the standard of care. [*See* Record No. 38, p. 19.] "A physician has the duty to use the degree of care and skill expected of a competent practitioner *of the same class and under similar circumstances*." *Hyman & Armstrong, P.S.C. v. Gunderson*, 279 S.W.3d 93, 113 (Ky. 2008) (emphasis added). For that reason, factors such as locality, availability of facilities, and other circumstances are taken into consideration. As Daniel recognized in his deposition, recommendations set by bodies of medical experts may constitute goals but do not necessarily set the standard of care when all practical considerations are taken into account. *See Smith v. Bama Urgent Medicine, Inc.*, 2012 WL 13088764, at *7 (N.D. Ala. Feb. 29, 2012) (observing that American Cancer Society recommendations regarding colon cancer screening did not reflect the predominant standard of care).

Because the plaintiff has failed to raise a genuine issue of material fact regarding the standard of care for lung cancer screening with LDCTs from 2015 through 2019, the defendant is entitled to summary judgment.

---

[4] Dr. Furcolow testified that an LDCT "could be done in the community" in February 2016, but it is unclear whether he meant that LDCTs were actually available in the community or simply that veterans could be referred out to private providers for procedures that were unavailable at the VA. [Record No. 31, p. 20]

## IV.

Based on the foregoing analysis and discussion, it is hereby

**ORDERED** that the United States' motion for summary judgment [Record No. 36] is **GRANTED**.

Dated: March 7, 2023.

Danny C. Reeves, Chief Judge
United States District Court
Eastern District of Kentucky